Good morning, your honors. May it please the court. First, I would like to advise the court that this week, I believe it was Wednesday, Judge Perez Jimenez entered an order amending or clarifying the record. I don't know if it's been docketed with this court. I haven't received an electronic notification to that effect, but this was in relation to the question of the final words of the prosecution in which I had raised a due process issue because the transcript said that those final words were believe me and Judge Perez Jimenez found that they were indeed Mimi. Mimi, the name of my client. We somehow got notice of that. Well, I'm advising the court, I haven't received notice either. We somehow got notice of that. Excuse me? We somehow got notice that the transcript had been amended. Yes, all right. So I'm not It is an extraordinarily uphill battle, always. This is an unusual case in that there were no seizures, there were no recordings. Ms. Sonia Flores was seen on a videotape that ran for seven months, focused on the drug point, on one afternoon at 3.38 with a girl in a school uniform. And the witness, Xiomara Berrio, said, yes, she had a daughter who went to school and she went there every afternoon to pick up her daughter. So she was right across from the school with school children. She was not involved in selling drugs. The evidence in this case, instead of anything objective, consisted of the testimony of two cooperating witnesses. There were many problems with the cooperating witnesses' testimony, including what I will talk about later, which is the ways in which the defense was not able to impeach them and the false statements of Harry Smith Delgado about how he gained entry and credibility in this conspiracy. But I first of all want to concentrate on what the evidence was against Ms. Berrio. It was the testimony of these two cooperators, Xiomara Berrio, who sold the drugs that my client was supposed to have been a runner for. The prosecution opened in its opening statement saying, we will prove that Sonia Flores Rivera was a runner, whose duty was to keep the sellers supplied with drugs. That testimony, that evidence, did not appear at trial. Xiomara Berrio, at one point, said, yes, she was a runner, and the court, I'm sorry, she was asked, do you recall, Xiomara Berrio listed the runners and left out Sonia Flores. The prosecutor then asked her, do you recall any other persons who acted as runners? And Xiomara said, Sonia Flores as well. Then there was an objection, because she immediately said, she never supplied me. And there was an objection on my lack of personal knowledge and hearsay. And there was a discussion, and the defense counsel moved to strike, and the court said, you want it stricken, I'll strike it. There was no testimony that Sonia Flores ever supplied drugs to any seller. The theory that she was a runner was, Xiomara Berrio said, I saw her come to the housing project with bags of material that she would take to her sister, Sandra Flores, to count. Those bags were bags into which she had never seen. She had no personal knowledge, no basis for concluding that there was any substance in those bags, let alone each of the ones that she was convicted of aiding and abetting in the supply. Well, isn't it a fact, though, that the court, rightly or wrongly, let in testimony that everybody knew what was in the bags, and everybody knew that the bags were drugs? No, no. There was no testimony about everybody knew. When Xiomara Berrio was asked how you know, she said, oh, because everybody knew what was said in the housing project. But there was no testimony that anyone knew what was in those bags. The prosecution tried to say, those are the same bags that Harry Smith Delgado said that another sister's brother would bring from Caguas. But the bags didn't match up. The testimony didn't match up because there were different sisters involved. There was no basis for any conclusion about what was in those bags. I submit there was no proof from which a jury could conclude beyond a reasonable doubt that Sonia Flores performed that function. There was another witness, Harry Smith Delgado. He said, oh, she stored money. How do you know? Because Manolo told me that when he got money from Diana, you have to infer Diana told him that he got it, that she got it from Sonia. That's the chain. Harry Smith Delgado reports that Manolo told him something that Diana allegedly told him. That's the only evidence to support the conclusion that she had the job of storing money. Harry Smith Delgado said, oh, and I know that she was a runner because there was a time when I stole the stash of drugs. And I heard somebody say that Mimi, Sonia Flores, was going to have to pay for that because it was her stash. Now, that was not objected to. It should not have come in. That if that is the basis for his knowledge, he was not part of the conspiracy when he was stealing the drugs. Harry Smith Delgado got to this housing project sometime in 2005, or it appeared, maybe 2006. And he hung out for a while as an addict. He was stealing drugs. He was, by his testimony, just hanging out for a while. And after Cruz Roberto Ramos Gonzalez acquired the heroin point, he began to be part of the drug dealings there for the separate heroin point. So, at the point that he would be in a position to hear this statement about Mimi, he was not part of the conspiracy. And that's the most concrete thing, really, that he could say about how he knew that she was a runner. She never delivered drugs to him either. Now, he said that he would see her at a quality when they were putting together the accounts. But he said he would see her at Sandra Flores' house, who's her sister, when those calculations were done at Sandra Fernandez' house. It is simply not enough to get the jury to a conclusion beyond a reasonable doubt. But I would like to submit that had the jury had all of the relevant evidence, it probably would not have reached that conclusion. And had the jury not been improperly subjected to an unsupervised readback that we have no idea what was in it. The jury struggled with the case against Sonia Flores. And it asked for a readback of specific testimony. It asked for a readback of the testimony of those two witnesses. And the judge said, well, I don't really think they have any doubt about that because they've already asked about quantity calculations, but we'll allow them to do a readback. And in chambers, the parties and the judge agreed that the readback would be done in the courtroom. And they all go into the courtroom. And then the judge begins to explain to the jury what's going to happen. And he asks the jury to vote on where they want to do it. And the jury decides to do it in the jury room. At which point, the judge then sends the stenographer into the jury room. There is no recording. And he tells the jury they can ask the stenographer to repeat whatever they want. They can go backwards or forwards. They just can't express any opinions. And we will never know whether the jury heard cross-examination or did not hear cross-examination. In addition, I would simply like to adopt the argument to be made by Brother Counsel and or myself later on the Napa Way issues. And if I could have one minute just to remind the court that Ms. Flores was sentenced for a 2D1.1B enhancement for firearms. The jury and the prosecution withdrew the firearms charge. When it did so, it said, we don't have the evidence, but we will bring it at sentencing. They did not bring it at sentencing. There was no evidence at sentencing. There was no evidence in this conspiracy that this woman who did not live at the public housing project had reason to know that firearms would be used. Because here, it was against the rules. Thank you. Morning, Mr. Hernandez. Morning, Judge. I'm back. May it please the court. I'm representing Chandra Flores, Sonia Flores's sister. I'm going to focus on basically one issue. And if I have time, I'll address the argument I raised on the constitutionality of minimum mandatory sentences, which I recognize the law is a battle on that particular issue. But someday it will come to be, I'm sure. Regarding the main issue that I want to argue this morning is the basically gratuitous introduction of 404B evidence, and I would respectfully submit rather prejudicial 404B evidence that was completely unnecessary. The government had basically three witnesses, at least cooperating defendants and cooperating people from the organization who testified against Ms. Chandra Flores. Harry Delgado was one of them, Guillermo Berrios, and Andy Mercado. When Ms. Berrios began to testify, the prosecutor brought out the fact that she was basically in shoe, or in protective custody, because supposedly there had been a plot, and they had found one of the, I believe Ms. Flores's niece, had what's called a shank, I guess, in prison for that lingo, and they were planning an attack on her. There had been testimony in the trial of the, there was sort of a family organization here, as part of this organization, excuse me, drug trafficking organization. On day four, at the docket 1583 and 51 through 53, I believe it was Mr. Delgado, one of the agents testified about all of the sisters, Diana, Mimi, Sonia Flores, Vicky, Jessica, Pote, and then Chandra Flores. They also testified about her, I believe her son, and other people that were related to her, supposedly being involved in this organization. They're all in the same prison, or being kept in custody at the same facility, and then the prosecutor brings out the fact that there's this supposed plot. There was no notice of 404B, there was no need for this testimony, and it was highly prejudicial. The government's response is that they were trying to beat the defense attorneys to the punch, and basically the defense was going to bring out the fact that Ms. Berrios was in, I'll quote, a shoe, because of her bad behavior, and they wanted to bring out the fact that, in fact, it was not because of her bad behavior, but for her own protection. Well, you know, the government had the option of obviously putting defense counsel on notice, that if they opened that door, the government would happily walk through it, and give the defendants at least the option of not having such highly prejudicial and explosive type testimony, I would respectfully submit, presented to the jury about this plot to kill a government witness, or to attack a government witness while she's in jail. It was not objected to. So the burden, I guess, that we have here is reviewing it under the plain error standard. I respectfully submit it was plain error, because of the nature of that type of testimony. Then, Andy Marcano, Alicia, when he testified, they had him testify about what basically amounts to a domestic dispute between, I believe it was Sonia Flores and Sandra Flores, I believe Sonia Flores was having an argument with Sandra about the fact that her daughter had had a relationship with her husband, a sexual dalliance, and shots were fired. Again, what relevance did that have to this case? The government argues that the relevance would be that the group, and Mr. Marcano showed up to talk to them about this, to basically tell them that they couldn't be conducting these shootouts at the public housing project, because that would draw attention to the criminal organization. Okay, I don't dispute that that may be part of it, but was it necessary? Given the other evidence, they had surveillance, they had photos, they had various cooperating witnesses, did they need to bring this out? Absolutely not. It was done, I respectfully submit, to try and get a 924C charge in the case to bring out guns with these particular two defendants, and ultimately the government conceded that they didn't have enough for the guns, and they dropped that particular charge. So, again, absolutely unnecessary, highly prejudicial. I've gone over with the standard on 404B, there was no notice of this particular evidence, for reasons known only to counsel, no timely objection was made, so I acknowledge that it has to be reviewed under the plain error standard, but I respectfully submit that plain error would apply in this situation. And although there was other evidence, I don't believe it was harmless error. This is highly prejudicial. Short of killing a government witness, I can't think of something that could be more prejudicial than being associated with the possibility of being involved with a plot to attack a government witness while they are awaiting trial, and then to just gratuitously bring up a domestic dispute to make them look bad and look like violent people. I have also cited, and there was no notice, they violated 404B, and part of the analysis is obviously the 403, whether that evidence, the probative value exceeded or outweighed the prejudicial impact on the defendant, and I don't think any analysis under 404B would allow for the admission of such testimony. I have also argued in my brief that while each one of these standing alone would be enough for a reversal, certainly cumulatively the two of them put together would amount to a reversible error, and then Ms. Flores would then be entitled to a new trial. The Court has no questions on those particular issues. I'm going to submit the issue on the constitutionality, because although the law is clearly heading in that, again, the right direction, the Supreme Court just reversed Harris in Alien, and I cite, I believe that's how you pronounce it, I never know how to pronounce that case, Alien. I cited that in a 28-J letter, and I asked the Court for permission to file a supplemental brief, and then I decided based on other cases that I had had with this Court, the Acosta case specifically, which that argument was rejected not to file a supplemental brief. It was not my intent to withdraw the Alien issue. I just simply didn't think it was necessary to file a supplemental brief. So unless the Court has any questions on that or wants to address that, I'll save the Court time of presenting that argument and just submit it on the brief. Fine. Thank you very much, Your Honor. Thank you. Mr. Kasperlein, good morning. Good morning, Your Honor. I represent Appellant Kasperlein Stortitz. It's a pleasure to be here before you. I'm going to concentrate all of my time, Your Honor, with the cumulative error that occurred in this case. There are so many multiple errors occurring that this Court should find that Mr. Benitez-Stortitz was deprived of a fair trial and his convictions should be set aside. Let's begin with the evidence that was hidden, concealed, and partially destroyed by the government in trial that should have been clearly provided to the defense counsel. First, there is a letter where Bermudez, Harry, which is the main cooperator, writes a letter to the prosecutor and states to her that he followed all of her instructions. And then he, in the second page, he begins saying, I will, and then that page is cut off. Now, Your Honor, the government claims that there was photocopying problems, and I submit to the Court that if you look at this particular document, which is in the agenda 107, you can see where the margins are all included, and that the space that is omitted or blocked would have or should have been photocopied when you see these margins. And it's clear that it was blocked. There was more than sufficient evidence to conclude that there was intentional concealment. The evidence was that the FBI had the originals and that the prosecution had a copy. No FBI agent ever testified at any of the hearings to explain why or what happened to the original. Now, under these circumstances, this particular document, had it been provided to the defense counsel on time during trial, they could have requested a spoliation instruction. The government had the burden to establish what happened with that document. They would have had to bring the FBI agent, and I submit that there's nothing in the record explaining what happened to that original. No FBI agent ever testified. The I will means that he was saying something to the prosecutor that he was going to do that was blocked out, and there's clearly a permissible inference that what he was going to do was something that the government did not want defense counsel to find out. Under the spoliation instruction, a jury could have found that the missing parts were harmful to the government's case. Now, let's go to the other two documents, which are also very important. I submit that the district court committed clear error when it stated that those documents were merely a cumulative and were collateral. First of all, we have, again, Harry, the main cooperator, talking about toilet conversations that he had with Andy and Lira, and during the trial, all of them testified, oh, we never spoke about the case. Even though Andy and Harry were three months in Fort Charlie, even though the CMR spoke with Harry through the toilets, they were all consistent. We never talked about the case. That was the trial evidence. Had the defense then provided these documents, Harry Smith informs the prosecutor on three occasions that Andy told him through the toilets, we need to help each other, and significantly, Your Honor, in the second time he says that what I want is that when we go out there, meaning Fort C, Fort Charlie, for us not to be enemies but friends and be only one so we can help each other. This is clearly evidence that indicates that Andy wanted to be on the same page with Harry and that all of them needed to get their story straight so that they could be only one. Three times, let's help each other, he says. Clearly, that's not cumulative, and clearly, it is not collateral. Your Honor, a matter is considered collateral if the matter itself is not relevant in the investigation to establish a fact of consequence. This court decided that in Millionare Navas, 111 February 3, 1988. Clearly, that was relevant to a fact of consequence. What was the main defense of Bermudez-Torres? That the three cooperators fabricated and made up a story about him. This is a defendant that two of the witnesses weren't able to identify him when they showed photographs. Mr. Bermudez-Torres never appeared in any of the 17 videos taken at the housing project. He was never arrested there. There was no policeman saying that he was ever seen there. There was no corroborating evidence. This was a pure credibility case. And the defense's main defense is, these people are lying about me. They didn't identify me when they were showing a photo of me. They got together in 4C and made up a story. The document of Harry where he mentions how on three occasions Andy was insisting that they needed to help each other was an area of cross-examination that would have created a lot of problems for the prosecution and could have created contradictions between these two cooperating witnesses. The third document is also important because there Harry mentions that Leroy accused them of preparing Cheryl Mowry, that he was preparing her for her testimony, a fact which they denied. Even though they admitted that they were talking through the toilets, of course, had they divulged this document, then the defense would have had Leroy clearly identifying and accusing Harry of preparing her. And, of course, his attempt to exculpate himself is because he knew that Leroy was going to try to cooperate, so he may have prepared this letter to try to contradict what Alito was going to say about him coaching Cheryl Mowry. These are all very important documents that far from being cumulative, there's nothing cumulative, the defense did not know the contents of these statements, that had they had them, they would not have just stopped with the answer, oh, we didn't talk at all in Fort Charlie. They would have been able to substantially and aggressively cross-examine these cooperators, and the jury, seeing these documents, could have arrived to the conclusion that, in fact, there was collusion between the three cooperators. So that's the part that was hidden. So let's go to the other events in the trial, where you have a... On those documents, was there any... I understand that you're saying they showed that the witnesses were lying when they said they didn't talk and compare notes. Well, that's the problem, because these documents would allow the inference. Are there any facts in the document other than that, that would have been in any way exculpatory? In other words, any admissions, anything substantively about the crimes or the testimony? Well, no, not in terms of specifics about the crime. But when you have Andy saying, when we get up there, we need to be one and help each other. I understand that. How about in the FBI notes? Is there anything in those that were not provided to you, in the rough notes, that were exculpatory facts? Of course, because we have been the aspect of legal. They never delivered something that the judge had, the briefings of Medina Pavon, which, again, Medina Pavon is totally exculpatory as to Bermuda, Your Honor. In fact, he totally excluded him from the offense condom. I don't see how the court could have concluded that that also was not in any way relevant to his defense. It should have been provided prior to trial. Thank you. Thank you, Your Honor. Thank you. Ms. Blackhill. Good morning again. If I may, Rob from Peter DePay Poll, I just would like to make a footnote to Brother Counsel Hernandez's argument to clarify that it was not Sonia who was having the shootout with a sister about a dalliance. It was another one of these sisters. I am arguing now on behalf of Cruz Roberto Ramos-Gonzalez, and to a large extent, I would like to follow up on and particularize the argument of Brother Counsel with respect to what the jury never learned. Mr. Ramos-Gonzalez is serving a life sentence as a result of a conviction that depends entirely upon the testimony of three cooperating witnesses. In its brief, the United States said, well, this is like Paladine, and this new trial evidence would not have made a difference. But in Paladine, there were controlled buys. There was specific objective evidence. Here, we are talking about a conviction that depended entirely upon the testimony of these three cooperators with respect to Mr. Ramos-Gonzalez. The jury specifically heard each one of these three cooperators deny that they communicated when it presented testimony. Additionally, the prosecutor who was presenting those witnesses had received not one but three notes from one of them recording those conversations among them, documenting the falsity of their denials before the jury, all three of them. Because the prosecution had not disclosed the letters, the jury never learned this. At one point, Andy Marcano was asked about the possibility, had he ever communicated, hadn't he communicated with Harry about the case? Quote, it is strictly prohibited to communicate about the case. In the letters, Marcano to Harry, I am pissed off. Why do they have me down as an enforcer? Well, he knew that the source that he was complaining to, Harry, was why he was down as an enforcer. And then he said, what Brother Counsel said, what I want is for us to help each other. In another letter, a report authored by Harry Delgado, sorry, the letter, three reports handwritten to the prosecutor, not disclosed. A letter, dear prosecutor, no, by her name, from your best cooperator. I'm sorry, Counsel, just for clarification, the prosecutor had that before trial? Yes, had that before trial. And he is begging for a little favor, not a huge favor, a little favor, in return for all he had done to get more and better evidence for the trial. And I will. And there the letter breaks off. Now, the jury would have an entirely different view, I submit, of the value of that cooperator's principle, star witness, your best cooperator, if it knew that he was not testifying merely because of a religious conversion and a desire to join his family, and because he had sworn to tell the truth, but because he had a desire to prove himself as your best cooperator. The same principle witness created an elaborate story about how he was allowed to be part of this conspiracy and in charge of all the heroin, he was a heroin addict, he was allowed to be in charge of all the heroin for Harry Smith Delgado because he had met Mr. Ramos-Gonzalez in jail in Bayamón. And instead of agreeing that that didn't happen, the prosecution cross-examined the person who presented the records and easily convinced Judge Pérez Jiménez, who had overseen years of litigation about the prison system here, that those records were unreliable. The jury heard the testimony, heard the cross-examination, and the prosecutor was allowed to argue that those records were unreliable and should not be believed. They were not challenged, they were business records, they were introduced in evidence, and the prosecution had to have known that this elaborate presentation card was a fabrication by Harry Smith Delgado. Finally, Judge Carriana asked about whether there was anything in the FBI 302s or the notes or the debriefings from Medina Pavón that was exculpatory. One of the issues at trial was Harry Smith Delgado's minimizing of his propensity for violence and his violent acts. There was a discussion between Medina Pavón and Smith Delgado about, remember that incident where I picked you up in Las Piedras. Harry denies at trial having anything to do with that murder. So there was definitely useful additional information there. With regard to Mr. Ramos-González, there was also exculpatory evidence with regard to the timeframe in which all of these things took place and the beginning of his participation in the heroin conspiracy, making it clear that, at least from the suppressed notes, that there was a basis for Mr. Ramos-González's defense that the owner of the heroin point, at least through 2006-2007, sorry, late 2006 when the videos were running, were the Nazario brothers. And that he, if at all, obtained the heroin point in 2006, which is what Medina Pavón said. So that was directly relevant. In addition, your honors, I want to adopt the cumulative error with respect to many of the judges' comments at trial,  you are out of line when they ask your moral barriers about the possibility of fabricating evidence and communicating with the other defendants, when after trial we learned that, in fact, is what happened. With respect to the sentence, I would like to speak for just a moment. The statutory minimum, excuse me, the statutory maximum for the offense here was 80 years. Mr. Ramos-González was sentenced to life in prison. There was a change in the law, but the statute is the statute and he cannot be sentenced to life in prison if the statute mandates no more than 80 years. I submit that is a plain, obvious, and substantial error that brings our system of justice into disrepute. As the Eighth Circuit stated in a case I cited in my brief, the court cannot impose a sentence not authorized by law. I have one minute to answer any questions. You have one minute and seven seconds. Does the court have any questions? This is a very fact-intensive case, so I'm not sure what's most useful to the court. Do you have anything else to say about the argument about the judge interjecting himself during the trial? Yes, Your Honor. I cite at page 12 of my reply brief many instances which are cumulative of each other and also compound the error of not permitting the defense to have the evidence, the Brady evidence, that the prosecution was withholding. The court corrected counsel with its own incorrect statement about Smith-Delgado's testimony, which was critical to his impeachment. This is quoted at page 12 of my reply brief. Argued with co-counsel about significant impeaching facts about Teomaro Berrios when the court's recollection was mistaken. Page 12 of my reply brief. I think that those errors are cumulative with each other and they could not have happened if the defense had been given the withheld Brady-Giglio-Napoi and the Napoi correction had been made. Thank you. Ms. Avila, good afternoon. Good afternoon, Your Honors. Smith Police Department, Assistant United States Attorney, Dina Avila Jimenez. The first issue that I would like to address is the sufficiency of evidence brought forth by Appellant Sonia Flores-Rivera. There's one, and the court may excuse me in this regards, but there was one part of the trial record that was not brought forth in the brief, our brief, and we would like the opportunity to be able to include that citation from the trial transcript if we're so allowed, and we'll get to that in a second. I know Sonia Flores-Rivera challenges the fact that in this particular case against her, Teomaro Berrios-Rojas was one of the three government witnesses. As Your Honors know, there were three main government witnesses or the only government witnesses because the main one was Harry. Andy, Teomaro, and Harry. In the case of Teomaro, Teomaro did testify that Sonia Flores-Rivera acted as a runner for the organization, and she did admit that although she did say that she saw Sonia arrive at the housing project with a bag of narcotics, she did not see the contents of those bags. However, taking that into consideration, when looking at Harry's testimony, Harry testified that he would go with Reynaldo. Reynaldo was another co-conspirator. He was the husband of Nancy Flores-Rivera, one of the other sisters, and he was also indicted in this case just like Nancy. He would go with Reynaldo to the Calwas area to pick up the large bags of narcotics, and when they would arrive at the housing project with a large bag of narcotics, Harry would stay behind while he would observe Reynaldo go into Vicky's apartment. That's Carmen Flores-Rivera, one of the other sisters. And as Reynaldo's going in there with that bag of narcotics, there would be Sonia Flores-Rivera, who's also known as Mimi, among the other sisters, Diana Flores-Rivera, Sandra Flores-Rivera, Carmen Flores-Rivera. So although Xiomara did not know the contents of those bags, we had testimony about Harry's about something similar about those bags coming in. What you just related about Harry's testimony, that's Harry Delgado? That is correct, Your Honor. What you just related, was any of that testimony independently corroborated? Independently corroborated about that particular fact? Yes. No. So that fact, if the jury had disbelieved Harry, then your case against Sonia, does it go down the drain? No, because then we have additional facts that support the testimonies of Xiomara and Harry. Because, as Your Honors know, Andy didn't talk about Sonia. In the case of Harry, Harry testified through a co-conspirator statement that he received from the second person in command of the organization, Jose Manuel Zavala-Marti, who's also known as Manolo. He indicated to Harry that Sonia was in charge of the drug proceeds, even though it's not narcotics, but he did make her responsible as being part of the conspiracy. Now you're now talking about what Harry's testimony is? Yes. Okay. Oh, and I need to go back to Xiomara. I'm sorry, I jumped. I'm getting a sense here that the jury believing Harry was pretty crucial for your case. Well, he was the main witness, yes. He was, and we can see to that, he was the main witness. What happened is he was corroborated in several other instances. And in this particular case as to the bag of narcotics, not necessarily corroborated, but in the case of Xiomara de Dios Rojas, for example, Xiomara also testified that even though when she was cross-examined that she didn't know what were the contents of the bag, she did testify that everyone knew. The problem with, in that respect, in regards to appellant's challenge is that Sonia didn't go further into questioning what that everybody knew meant. We don't have, because the record wasn't fully developed, everybody knew could have been another co-considerer statement like happened between Manolo and Harry. In addition, Xiomara was the person that testified about the letter. Why would that burden be on the defendant to probe? Why would you expect the defendant to put on evidence to support the government case? Not necessarily that, but there was no objection from the defendants themselves as they're cross-examining Xiomara as to what everyone knows, and now they're challenging as to this probably being hearsay. But did he say that everybody knew that it was drugs? I can't remember the exact phrase right now. I have to look up, but it was everybody knew. When she was asking, I'm sorry. Because I thought the record was everybody knew it was drugs, but they corrected me on their argument saying that that wasn't the evidence. It was that everybody knew without stating what everybody knew what everybody knew. I don't want to misquote the record, and I would need to look up directly the transcript, but if I recall correctly, everybody knew was in response to a question whether there were narcotics in the bag. So it wasn't that she said everybody knew it was drugs. It was a response to if she knew that the bag contained narcotics, and the response is everybody knew. Does it make sense what I'm saying in that respect? But the other evidence is in this particular case, Xiomara testified also about the drug ledgers, the one that were kept by the accountant or the administrator as to, when I say administrator, not administrator of the drug point, but administrator of the books, the accountant, Sandra Lacaderua. Do you have any particularly incriminating evidence for any of these defendants that is not in the form of testimony by one of the cooperators who denied they compared notes, yet we now know they did compare notes? Okay. Independent, aside from their testimonies, in regards to Cruz Roberto Ramos-Gonzalez and Carlos Omar Bermudez, we don't have other than testimony. In the case, I mean implicating them specifically. In the case of Sandra Flores Rivera, she is recorded. She is recorded selling. In Xiomara, as the video is being presented, she testified as to seeing Sandra Flores there as, if I remember correctly, Sandra's other brother, who was also indicted in the case, Alex Nino, and they're dealing with some of the crack vials. If your honors remember, the way that witnesses described the crack vials as they were packaged was in popsicle form. They would come in this line of plastic, in little plastic bags, and they're ripping off the bags. So she's there in front of her house where the drug point was located. Wait a minute. This is Sandra? Sandra. Sandra? You're saying Sandra is recorded dealing? Yes, your honor. Or he's just in front of the house? No, no. She's in front dealing. There's sort of like a change of shift. She's with one of the packets that's being ripped off. Now, in the case, and then there's other recordings where you see her going when a buyer comes in to the area where they're going to sell. She goes into her apartment, and then through a window she's giving drugs. You don't see her face, but the inference can be made, and the jury could have made that inference that she's the one that's selling those drugs, because it's not until the seller comes up to her that she goes in, and then someone is giving something to the buyer. I'm sorry. How do you tell from the recording that it's drugs? It's based on the testimony of the witnesses who were part of the conspiracy, knew how the drug sales were operating. You're back to the witnesses who compared notes with each other. Well, they didn't compare notes with each other, your honor. If your honor wants, if I can just say one more thing about Sonia Flores Rivera, and then I can go into that issue if I'm permitted briefly. In the case of Sonia Flores, because I was asked whether there was any other evidence aside from testimony, there was the drug ledgers, and I know there's an issue that is brought and challenged about when Xiomara identifies the MI, those initiatives of Miguelito or of Mimi. But what is left out is also in that, in the testimony of Xiomara, Xiomara testifies and reports indulgences. I think I left it on my desk. There's Exhibit 39. There's an Exhibit 39, which is one of the drug ledgers, and that's one of the parts that I was saying if I would be allowed to supplement the record with a citation to the record, in which Xiomara testified that actually Mimi appears. It's not just MI. There's further testimony about Mimi appearing in the notebooks, and in those notebooks, she has money next to the name, and what the witnesses testify is normally the person that could borrow money would be the runners or the owners. It couldn't be just anyone just borrowing money from the drug point. So there's additional evidence in that document. Now, in regard to the claims made by opponents that the witnesses were confabulating with each other, I would like to address each, if I'm allowed, each one of the issues that they're raising, particularly I'll start with the letter. I need to clarify for the record that, respectfully to Councilor Baquiel, she misstates the record. The letter does not say, and let me go here. The letter, Harry doesn't say the letter from your best law operator. She said it like three times during her argument up here. From your best law operator. The letter does not say that. It says from the best law operator. He never says that he's my best law operator. Notwithstanding that, yes, as Judge Thompson had asked, that letter was produced post-trial. What happened in this case, if Your Honor looks at the indictment, this was a seven-count indictment, six counts, which were the drug counts, and then there was the forfeiture counts, which was a tenth count. During the process, pretrial process, we started to investigate allegations of witness tampering, and the witness was Harry. During that process and that course of investigation, what happened is we had Harry make notes while he was in prison, because he was getting contacted not only by the attorneys that were attempting to tamper with his testimony, but he was actually getting also communications through the toilets from other members of the organization, like Manolo Zavala-Martin, and also John Carlos Medina-Flores, and another individual by the name of Ponejo. Who were the attorneys? The attorneys, it was attorney Ramon Delgado Rodriguez, known as Bronco, who pled guilty. It took five years, he already served his time. And the attorney Miguel Arroyo Arroyo, who also pled guilty, he got probation. So these were attorneys representing co-defendants? They were not attorneys of record at all. Ramon Delgado Rodriguez was the attorney known in the street as the attorney for the organization. He was a local attorney. And then Miguel Arroyo Arroyo was another attorney that was brought in, unfortunately, and I say unfortunately because he didn't have the same reputation that Ramon Delgado Rodriguez had in the street. This old man needed the money. He had some money issues, and he was going to get paid $500 to notarize the false warrant statement. But he fell into the scheming, and he was charged and indicted, and then convicted. Counsel, on the letter, sometimes we have braiding material, and some detective had it, and the prosecutor doesn't know about it. I understand that this is a letter from the star witness in a major case to the prosecutor. Correct. How did that not get turned over? What happened is, and that's what I was getting at, because when both the counts for the obstruction of justice charges, which were the new counts, 7, 8, and 9, that I'm talking about those attorneys that we also added, and the other two individuals we mentioned, I have kept both cases separately. My binders for drug trafficking, because I'm the prosecutor, the original prosecutor of the case, and the prosecutor that received the letter. My case for drug trafficking separately from my obstruction of justice files. What happened is that letter, and I explained this when I testified on June 8, 2010 at the evidentiary hearing, that letter, it had to be given to me through the agents, the copy of the letter, because the agents normally keep the original, during the time that we were investigating the tampering of the witnesses. When I'm going to go, I go to Toronto Drug Trafficking, I don't have it in these files. When I go and prepare them now that we have the commissions here a few months later, I go through my obstruction of justice files, and I find that letter. And I find that letter, along with two additional notes, because Harry had been making notes throughout the witness tampering investigation, but there's two notes that have nothing to do with the witness tampering, but I had put them there in those binders of the obstruction of justice, so they were not produced over here. How frequent is it you get a letter from a STAR cooperating witness directly to you that speaks in such enthusiastic terms about helping you? Yes, that was the first time ever. That was the first time ever. And being candid with the court, it was the first time ever, and I know where your honor is getting at, that probably I should have remembered. I probably should have remembered, and I accepted the mistake, and I was the one who brought it up. One thing that I need to reinforce here is once I discovered that letter, and as I testified on June 8, 2010, once I discovered that letter, I had the agents go through all their 1A files, 1A files are what the FBI keeps, they're originals. They could not find it. I immediately consulted my superiors that didn't think it was a big deal. Notwithstanding that, I still produced it not only to the defendants that went to trial, but also to the defendants that had pled guilty. Are you saying your superiors didn't think you should produce it? They didn't say I shouldn't produce it. They didn't think it was a big deal, what it said. Let me ask you about that. I mean, I've read the letter. Doesn't it, it paints this person as a fawning, enthusiastic supplicant who really wants to help the prosecutor and is currying favor for them. Well, the way we see it is it's a cooperating defendant who's really trying to negotiate with the government, which is normally what cooperating defendants do. When one looks at the letter, the letter talks about, one of the first things that he talks about is about the relocation of his then-consensual wife, Jeanette. And that's one of the issues that were brought up by trial counsel for Bermudez-Torres, Counsel Fernando Caro, that preferably the government never ever made an intention about Jeanette being relocated or being helped to be relocated by the government, which is completely untrue because that information had been provided to the defense through a discovery letter of August 3, 2009. Well, if that letter, if you produced that letter during the trial, you probably wouldn't have been surprised, would you, if it had been read to the jury as part of a closing argument? No, it would have been hearsay. It would have been hearsay. Now, they could try to have... First of all... It's impeaching your star witnesses, isn't it? Is that a court statement to the prosecutor? But it wouldn't come in as substance of evidence. No, but it could come in on his credibility. And wasn't the defense in this case basically hinged entirely, as the prosecution did, on the credibility of your cooperating witnesses? They were hinging on the credibility of the witnesses, and yes, but in this particular case, Your Honor, in the letter, not only talks about a benefit that had been disclosed to the defense, they did have it, it talks about some requests by a cooperator of... Guess that. Requests. There were no benefits given, for example, about talking about the probation officer of Jeanette, or talking about when he gets transferred to a prison and being able to get a court order so Jeanette can go and visit him. Those were not benefits at all. And then in this particular case, when you look at the record, which we, at the record below, the extensive amount of benefits that were disclosed, or the extensive amount of potential impeachment material that were disclosed as to all three witnesses, but more particularly as to Harry, belies any assertion that this letter was hidden on purpose, more particularly, as the district court correctly found, this letter was not kept from the defendants in that faith. There was an explanation in the court as it indicated in its opinion and order after the additional hearing was held. The court indicated that... But, counsel, but a Brady violation doesn't just occur when the withholding of the information is willful. No, but there's two issues. First of all, there's the Youngblood case, which is they're talking about how we destroyed the evidence as Mr. Castron came up here that we purposely said that second portion of the page that's incomplete. And then there's also the Brady violation that they claim happened in here. But there's no Brady violation in this particular letter because in this letter, there's nothing that's exculpatory as to any of the appellants. There's no information that's exculpatory and any impeachment value that that letter may have, if any, is completely negligible. That wouldn't have changed the outcome of the jury's verdict because Harry was extensively cross-examined about his motives to testify as to the fact that he wanted a lighter sentence because he was facing 20 years. He signed a plea agreement for 20 years. He was also doing this for his daughters when he testified when Sandra Flores Rivera presented that video of him talking to his children. So any information in this letter was completely either collateral, that was just going to be used to just contradict Harry, just for the sake of contradiction, or it was just cumulative as to information that he had already been extensively examined on. And then in regards to the two notes that were, and this is the issue that I really want to talk about, if I may, because it's really important in this particular case as to these notes, the relevance as to why is it that the notes that were provided also post-trial, those are the notes of the conversations between Harry and Andy and legal. And they were provided post-trial. And why is it important? First of all, those notes clearly, clearly do not provide any exculpatory evidence against Appellant Ramos or Appellant Bermudez or any of the four appellants before the court today. There's nothing exculpatory there. If there's anything potentially exculpatory, it's Lito and Andy trying to exculpate themselves, trying to convince Harry that they were a lesser role than they were. That's number one. So it's collateral. Whatever information in that regard would have been collateral just to contradict Harry. Number two, it was cumulative. Because in this particular case, the witnesses were extensively examined as to their conversations between themselves, whether it was when Xiomara testified that she did say she spoke through the toilets with Harry, or whether Andy and Harry were talking to each other inside Fort Charlie, which is the local cooperators' unit. I thought Harry and Andy denied that they'd been speaking about the case. Yes, and this is the thing. If Your Honor looks at the transcript, they're talking about when they're in Fort Charlie, right? When Harry's in Fort Charlie. But in the letter, the notes, the notes are dated December 9, 2008. Andy becomes a cooperator after December 9, 2008. So when he has this conversation, he's still not a cooperator. Who in your office was handling the other? Were you handling the other case? Oh, yes, I handled both. So when you're trying this one, do you know that they've been talking with each other in the other case? In the tampering case? Yes. But no, but Andy and Alito are not talking, and I'm sorry if I confused Your Honor. Andy and Alito are not talking about the tampering case. They had nothing to do with the tampering case. The reason I brought up the tampering case is because Harry was writing these notes, and I kept track of those notes for the tampering case, and when these other notes come in, I put them inside the binder of all the Harry notes that he had, the ones that I had from him. So I put them in there instead of putting them in the files for drug trafficking. Andy and Alito had nothing to do with the tampering charges. In addition, there was an evidentiary hearing held in September 2012 where the defense's own witness, Gabriel Medina Pavon, also known as Alito, testified that he had spoken to Benny Soto, Appellant Ramos's investigator, prior, prior to the defendants or the appellants having gone to trial. And he had indicated to Benny Soto, and he says at one point during his testimony that he spoke to Ramos Gonzalez, also Appellant Ramos, that he told Benny Soto that, preferably, Xiomara and Harry were trying to confabulate their stories, that Harry was trying to coach Xiomara. So why is this important and relevant? Why? Because Brady, when a Brady violation occurs, it's because the government withheld exculpatory evidence that the defense didn't have access to or didn't have a way to be able to get access to that. But in this particular case, the defense already had the essential facts that they could use in order to cross-examine the witnesses. They already knew before they went to trial that, preferably, Harry and Xiomara were talking to each other through the toilet. Number two, this is further evidenced by the fact that Counsel Luis Rivera Rodriguez specifically asked Xiomara Berrios Rojas, isn't it true that Harry convinced you to cooperate? He doesn't ask that from Andy. He asks that directly from Xiomara, which is the one that Lito kept on insisting was supposedly being coached by Harry because Lito testified at that evidentiary hearing that Harry never tried to coach him and never tried to coach Andy. So Counsel had those essential facts. Go ahead, Your Honor. Did they know that they had apparently agreed to act as one? I'm sorry? In Harry's notes, there's some indication that the plea was made among them that they should act or testify as one. Can I look at the notes really quick, Your Honor? My question is whether the defense counsel knew that. That statement was made. I just want to clarify that the statement was made since Counsel Vaquel had misstated what the letter said. I want to make sure that Counsel Strong said the correct thing. I'm sorry. Yes. He says at one point, Andy, according to the notes that Harry wrote from December 9, 2008 at 9.18 p.m., he talks about, among other things, that he's going to cooperate. This is Andy. This is what Harry says Andy says, and that he's going to bring down the people that were left out, etc., etc., because they wanted to kill Andy when he was on the street. He says, so when we go up there, and he's referring to himself and to Lito, when we go up there, I don't want to be enemies. I want to be friends and only be one to help us. Now, that can be, I know Counsel is trying to read much more into it, but if you read the notes into context, it doesn't seem like it's saying, oh, we want to be one in terms of confabulating our testimony. It's about let's be one, let's not be enemies. Let's be able to stick together on this, because Andy was concerned about when he got to Fort Charlie and so did Lito, because even Harry says himself in the notes, Lito, you and I are not friends, that when they got up there, that they were not going to be received. So he's trying to curve a favor from Harry to make sure that when he gets there, Andy, that he's welcomed. But this is more important because Lito testified that Andy wasn't coached. Andy wasn't coached by Harry. In addition, Brady doesn't require that the information, those essential facts be documented in a paper. They had the information, those essential facts from which they could use to be able to cross-examine the witnesses as to the issue on the defense theory that they were properly conforming their testimonies. I'm sorry. Did they acknowledge in court, to the extent that it's borne out by the notes, did they acknowledge in court that they were? I'm sorry. Did they acknowledge in court in response to what questions may have been asked that they were, in fact, coordinating testimony? Who acknowledged? The witnesses. Did they acknowledge that they were confabulating? Yes. No. They did not? No. So why wouldn't having the document indicating that they were have been there to be used for impeachment? Because it would have been cumulative. They already knew it with Gabriela. I'm sorry. It's not cumulative if they don't acknowledge it in court. It's cumulative if they acknowledge it in court and then defense counsel tries to beat a dead horse. But if they don't acknowledge it, then they have a right to use the prior statements to impeach. But they already – that's what I'm trying to say, Your Honor. They already knew. They already knew before going to trial that supposedly these witnesses were talking to each other in the toilet. Simply because they knew the attorneys aren't going to get up there and testify. They may have had some information, but if the witnesses don't acknowledge it from the witness stand, they have no place to go with that. Well, they have Gabriela Maria Pavon. The same way they brought the Puerto Rico Correctional Director of Penal Records to testify on their defense case, they could have brought Gabriela Maria Pavon that, according to Appellant Ramos, was always willing and available to testify on their behalf, despite what his counsel, Mr. Massini, said. So they had this information. Brady doesn't require that essential facts that they can make use of be documented, especially when these essential facts that are here in these notes were already available to them through Gabriela Maria Pavon. But that's where, I guess what Judge Thompson says, the big difference between me thinking a fact is so and having something signed by the witness saying it's so. That's a big difference. I don't understand. The way we read Brady, it doesn't require it. This may have been helpful to the issue, but it's not required under Brady because they already have the facts. So if I think you paid off a witness and paid them $100,000, and I think that's a fact and I ask the witness and the witness denies it, and then there's a letter there, a video of the witness getting the $100,000 saying, I don't need that in Brady because the defense lawyer already did it. But the thing is, it's not only that. Nothing in these notes, when you look at the notes, there's nothing in these notes that suggests that they're confabulating their testimony. The only problem with that argument is that that is the government's version of what those letters mean. The defense have another reasonable inference to be drawn that is just as reasonable as the government's inference to be drawn. And therefore, not having it means that they were deprived of a right to question the witness about their testimony. But they already had the essential facts. It's not like this. If this didn't exist, they still had the essential facts. What Appellant Ramos did was set up the scene, knowing that he had all these facts, let me ask this question so that I can have initial appeal because it's not the first time he does it. And in this particular case, that's exactly what he did. When he asked the Omana directly that question and started asking the other witnesses about what they taught in Fort Charlie, not prior to Fort Charlie, in Fort Charlie, then it's because he already knows what Gabriel Medina Pavon had said. Because Gabriel Medina Pavon, who's their witness, testified to that effect. He already had testified about Benny Soto having interviewed him or spoken with him over there at MDC. And so these notes, it is the government's decision whether they have been produced or not. And I'm not saying that I wouldn't have produced it. Don't get me wrong. Because as I said when I testified, I would have produced it if I would have remembered them. And I would have had it in the sign that I was supposed to. I'm not saying that I wouldn't have produced it, just like with the letter. I would have produced it. But these notes do not, the contents of them, would not undermine the confidence of the jury's verdict, particularly when they had that information prior. In regards to that, in the case of Special Agent Barredo's notes, which is the agent that had come out of the academy, if you'll remember from the transcript, that was there taking notes as Gabriel Medina Pavon was being interviewed in November 2008. Appellant Bermudez makes much ado to the fact that because Gabriel Medina Pavon, during that interview, never inculcated Omar Bermudez during the time of the conspiracy, that means then that that information is exculpatory. That's not necessarily true. While Gabriel Medina Pavon said that he knew Omar Bermudez from 1991, and he cooked the crack and owned the marijuana at the housing project. But he didn't say Omar Bermudez had nothing to do with the conspiracy with Appellant Ramos from 2004 to 2007. Then when he comes and testifies at the evidentiary hearing where he was seriously impeached, he kept on saying, I had heard, I had heard, I heard this rumor, I heard this other rumor. Having heard rumors is neither exculpatory. Whatever testimony that Gabriel Medina, whatever value that Gabriel Medina's statements to the FBI regarding Omar's lack of participation or participation thereon in the conspiracy charge in the indictment, which is neutral evidence, it was not favorable to him. The only thing that would be false for that could inculcate Omar Bermudez if at all could be used is the fact that he was not a stranger to drug trafficking and that he used to hang out with Appellant Ramos all the time because Gabriel Medina told that to the FBI. But even then, it was outside 2004 and 2007. It was in 1999. So there's nothing in the notes that are exculpatory. And now in regards to that little portion, that one paragraph that is a note of Carlos Barreiro's notes that where it says specifically, and I want to read it. And I'm going here to Appellant Bermudez-Estores Appendix, Volume 2, specifically, page 393. In that note, in those notes of Carlos Barreiro's, he says, Medina says, Jalette's wife told him that Xiomara had gone yesterday to the district attorney's office. Jalette and Andy tapped Xiomara's line, the phone line, which is the topo, the toilet, and listened to a conversation between her and Harry. Nowhere does it say here that Lito is the one who heard that conversation. He's talking about hearsay upon hearsay upon hearsay. Jalette's wife said this, and then Jalette and Andy supposedly heard Xiomara testify. And when Gabriel Medina-Tabón testified at the hearing, he specifically testified that he didn't tell the prosecutor, and these are from questions directly by Appellant Ramos' trial attorney. As to why he said, preferably told the government about toilet conversations, he says, there's a series of questions that Mr. Rivera-Ferreira is asking Gabriel Medina-Tabón during his redirect, or redirect, I can't recall right now, and that's at the evidentiary hearing transcript, page 37 of September 11, 2012, that Gabriel Medina-Tabón says, I just told him, well, I asked him if Xiomara was coming down to be interrogated, and Dina Avila answered me that she didn't know what I was talking about. It's not my practice to tell my other cooperators who are the other cooperators. Anything else about the conversations in the toilet, Mr. Rivera-Ferreira says. Gabriel Medina-Tabón says no. I just told him I was coming into the meeting and they asked me if everything was okay in the unit, if anybody was aware that I was coming over here, and I told them that everything was okay, but I had had an incident with Harry over the pipes. Next question. And what did Mrs. Dina Avila or the agent say, if anything? Nothing. I don't remember. So he didn't say that he was telling the government that Harry had been coaching Xiomara either. So now I'm telling Omar Ben Munoz-Torres, among the plethora of arguments for making that, the notes of Agent Barreiro's were exculpatory. They're claiming that that one little single paragraph would have assisted them because it was exculpatory or at least had some impeachment value to help them undermine the credibility of the witnesses. But this is completely contrary to what their own witness said during the evidentiary hearing. They never, he never told the prosecutor that, yes, they were conforming their testimonies. He says that he told them about the conversation, which is exactly what Agent Barreiro wrote, that they were talking, but nothing further. And when Agent Barreiro was asked in cross-examination by Appellant Bermudez-Torres' counsel, if they would have said something to that effect, that they were confabulating their testimony, would that have been important? Would you have put it in your notes? And he says, yeah, that would have been something important. And when he was asked that you put everything about what Lito said about the toilet conversation, he says, that's all I put in there because that's all he told me about the toilet conversations. So now come and say that the government was aware about the contents of the conversations between Xiomara and Hattie, and that Hattie was, in fact, according to Appellant's coaching, Xiomara is belied by the record itself and by the defendants or the appellant's own witness. Now, as to the issue of Appellant Ramos's, and by the way, I'm going to rest on the, in regards to Sandra Flores Rivera, I'm going to rest on the briefs and those arguments. In regards to Appellant Ramos's arguments about the purported NAPUI violation, where they claim that the government failed to correct the testimony of Harry Smith de la Lucanuelas when he testified of how he met Robert Belleza, or Appellant Ramos, also is belied by the record. In this particular case, as you can read from the record, we have the information that although Hattie had indicated that he had met this individual known as Robert Belleza while he was housed at Prison 308 in Bayamón, Puerto Rico, he had testified in the grand jury, and just like he testified at the trial, that he would speak with this person known as Robert Belleza, screaming from one building to the building or over the phone to negotiate drug transactions. Harry specifically testified at trial that he did not see the face of this person. I have provided the correctional records of Appellant Ramos and of Harry Smith de la Lucanuelas to the defense, particularly to Defendant Ramos, at the time prior to trial. And prior to jury selection, I brought it to the attention of the court that there was this issue, that the correctional records were different from the fact that Harry said that he met Robert Belleza in prison, but they were not in the same housing. But since the court said the defense didn't have to tell me anything about what they were going to do, I let it rest and I didn't bring it out on direct. Why? Because it would have been unduly prejudicial to Appellant Ramos, because it would have been improper for him to be evidence against him, because if I brought forth that evidence, then I was actually telling the jury that he was probably a prior convict or he had been in prison, and that was completely unnecessary. So then Appellant Ramos decided to bring it out in cross, and in cross-examination, he obviously harped on the issue that whether Harry was in the same housing as Appellant Ramos. In order to impeach Harry on this issue, they brought the director of penal records for the Puerto Rico Department of Corrections. And this individual testified that when he reviewed the records – my time is up. You finished your sentence? Okay, yes. That those records, they didn't appear just like we said, but those records sometimes contain mistakes to the point that prisoners are released mistakenly before their time. So the jury was able to weigh the credibility as to whether they believed Harry as to what he said or what the correctional representative said, or believed both and decided that Harry, in fact, was not talking to Florida Belleza, it was someone else making themselves believe it was Florida Belleza. And we submit the rest of the briefs. Thank you. Thank you.